IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JCK ENTERPRISES LLC,                    )
                                        )
            Plaintiff,                   )      TC-MD 130230N
                                        )
    v.                                   )
                                        )
LANE COUNTY ASSESSOR,                   )
                                        )
            Defendant.                   )      **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 31, 2013. The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

Plaintiff appeals the real market value of property identified as Account 1816212 (subject

property) for the 2012-13 tax year. A trial was held by telephone on October 16, 2013. David E.

Carmichael, Oregon licensed attorney, appeared on behalf of Plaintiff. Joe Karcher (Karcher),

Plaintiff's owner, and Jasen D. Hansen (Hansen), MAI, testified on behalf of Plaintiff. Jason

Baribeault (Baribeault), Appraisal Supervisor, appeared on behalf of Defendant. Bryce Krehbiel

(Krehbiel), Property Appraiser III, testified on behalf of Defendant. Plaintiff's Exhibit 1 and

Defendant's Exhibit A were received without objection.

## I.  STATEMENT OF FACTS

The subject property is a 1.16-acre (50,530 square foot) site located on West 11th Avenue

in Eugene. (Ptf's Ex 1 at 2.) The subject property is located in the "C-2, Community

Commercial" zone with "SR, Site Review overlay." (*Id.*) As of January 1, 2012, the subject

property was "improved with an access road [that] bisects the site, creating two non-contiguous

parking lots, each improved with asphalt paved parking areas and landscaping." (*Id.* at 6.) "[T]he area to the west of the access road is approximately 17,350 square feet and the area to the east of the access road is approximately 23,880 square feet," with the access road comprising the remainder of the subject property. (*Id.* at 28.)

A.      *Subject property's physical characteristics and possible uses*

The witnesses differed on several aspects of the subject property, including the suitability of site development as a drive-thru fast food restaurant, the visibility of the subject property, and the impact of the bisecting access road. Karcher testified that he is the owner of JCK Enterprises LLC, which owns the subject property, and has owned and managed fast food restaurants since 1990. He testified that he has ownership in 42 Carl's Jr. restaurants, including one located on the parcel adjacent to the subject property to the west. Karcher testified that, in his opinion, the subject property would not be a good site for a fast food restaurant because it does not include sufficient area to accommodate the turn radius of a drive-thru, and because the bisecting access road would require the parking lot to be located across the access the road from the restaurant. Karcher testified that the embankment and landscaping on the subject property resulted in poor visibility for the subject property. He testified that he is planning to make a lot line adjustment to the subject property with the parcel that he owns to the west of the subject property. Karcher testified that he plans to build a coffee kiosk on the west side of the subject property after making that lot line adjustment. He testified that, in his opinion, he could not develop the west side of the subject property without making a lot line adjustment. He testified that he has no plans for the east side of the subject property.

/ / /

/ / /

Hansen reported on the land-to-building ratios required for several types of commercial developments and testified that, to accommodate the radius of a drive-thru, the building would have to be less than 3,000 square feet. (Ptf's Ex 1 at 31.)

Krehbiel testified that the subject property's embankment provided superior visibility for the subject property. He also testified that the access road enhanced access to the subject property. Krehbiel stated that the subject property was not limited to being used for a fast food restaurant and could support other uses permissible under the C-2 zone, including "[r]estaurants, [s]pecialty food and [b]everage, [b]ank, * * * an[d] many other uses." (Def's Ex A at 16.) Krehbiel testified that both sides of the subject property were buildable.

B.    *Plaintiff's purchase of the subject property*

Karcher testified that Plaintiff purchased the subject property for $250,000 by warranty deed from First United Bank to protect his adjacent property, the Carl's Jr. to the west of the subject property. (Ptf's Ex 1 at 42.) He testified that people were starting to park RVs on the subject property. The sale was recorded July 2, 2012. (*See* Ptf's Ex 1 at 71.) Karcher testified that he considered $250,000 a fair price for the subject property and that $430,000 is probably a bit high.

Hansen stated that the subject property "had been listed for a number of years" prior to the sale to Karcher. (Ptf's Ex 1 at 42.) He stated that, "[d]uring the listing period, there was a deed restriction on the subject property preventing development of the site with a fast food use. This deed restriction was subsequently removed." (*Id.*) Hansen considered the sale of the subject property to be a "low indicator[] of market value for the subject [property]." (*Id.*)

/ / /

/ / /

C.    *Plaintiff's appraisal of the subject property*

Hansen prepared an appraisal of the subject property. Hansen relied solely on the sales comparison approach. (*See* Ptf's Ex 1 at 32.) Hansen stated that "[t]he Cost Approach was omitted * * * because it is not considered an applicable approach for valuing vacant land[,]" and that "[t]he Income Approach was also omitted since a project has not been proposed for the site." (*Id.*) Hansen included six comparable properties in his analysis, five sales and one listing with an offer. (*Id.* at 35.) Hansen's comparables ranged in price from $3.98 per square foot to $32.91 per square foot. (*Id.*) The comparables ranged in size from 0.34 acres to 4.33 acres. (*Id.*) The comparable sales dates ranged from April 2009 to March 2013. (*Id.*) Hansen made qualitative adjustments for categories labeled "sale date"; "location"; "site size"; "zoning"; "utility"; "access/exposure"; and "overall." (*See id.* at 37-41.)

Hansen stated that comparable sale 1 "was the result of a bank disposition and reflects a motivated seller." (Ptf's Ex 1 at 37.) It had been "listed for a number of years at $1,614,000 or $8.56 per gross square foot and was foreclosed on in early 2012." (*Id.*) Hansen described sale 1 as "4.33 acres (gross)," but explained that it included only "2.5 buildable acres due to a bike path and creek traversing the southern side of the property." (*Id.*) "The sale price reflects $6.89 per square foot of developable area, with 42 [percent] undevelopable site area." (*Id.*)

Hansen's comparable 2 was a May 2009 sale of 0.34 acres zoned "I-2," which his report states is inferior to the C-2 zone. (Ptf's Ex 1 at 38.) Comparable 2 sold for "$8.27 per square foot of gross area. The price is $8.45 per square foot of developable area[.]" (*Id.*) Hansen stated that comparable 3 "is the current listing and most recent offer for commercial development land in the Crescent Village development in Eugene." (*Id.* at 39.) According to Hansen, the "offer was * * * made on approximately 30,000 square feet of land for $13.33 per square foot." (*Id.*)

"The potential buyer indicated that they planned to construct an office and would have paid up to $15 per square foot for the land." (*Id.*)

Hansen's comparable sale 4 was an 81,022 square foot parcel zoned C-2 which sold for $15.24 per square foot in March 2013. (Ptf's Ex 1 at 40.) Hansen stated the site "is 100 [percent] developable" and "has exposure to East 8th Avenue and Ferry Street, but both have relatively low traffic in this area." (*Id.*) "The site was purchased by Northwest Community Credit Union for development of new office headquarters." (*Id.*) Hansen's comparable sale 5 was a 22,264 square foot parcel in the C-2 zone that sold for $26.95 per square foot in August 2009. (*Id.* at 40-41.) Hansen stated that the site has "excellent exposure and access from two streets." (*Id.* at 40.) The site "had improvements at the time of sale which were demolished to make way for a new development (Dari-Mart and carwash)." (*Id.*) Hansen's comparable sale 6 was a 19,750 square foot parcel zoned "S-C2" which sold for $32.91 per square foot in April 2009. (*Id.* at 41.) The site "was improved with a restaurant at the time of sale. The improvements were demolished after the sale and an Aaron's retail store was built on the site." (*Id.*)

After making qualitative adjustments, Hansen determined that "an appropriate value for the subject[ property] * * * is $8.50 per square foot" resulting in a total real market value of $430,000 (rounded). (Ptf's Ex 1 at 43.) He explained his determination, stating:

> "The majority of recent sales of commercial land have been under $20 per square foot, mostly for fully developable parcels. If the subject was fully developable (level and contiguous) it could likely command a price of approximately $15 per square foot. However, the subject has some significant development impediments due to topography, lack of contiguity and a portion of the site located within the access roadway. Each of these factors puts a downward pressure on the price per square foot for the subject."

(*Id.*)

D.	*Defendant's appraisal*

Krehbiel also prepared an appraisal report for the subject property. (Def's Ex A.) In his report, Krehbiel considered "the three approaches to value": cost, sales comparison, and income capitalization. (*Id.* at 18.) He determined "the cost approach and the income approach * * * to be inapplicable for vacant land." (*Id.*) Krehbiel "relie[d] on the sales comparison approach to * * * establish[] real market value." (*Id.*)

Krehbiel presented six comparables, of which five are sales and one is a listing. (*See* Def's Ex A at 20.) The sale dates of Krehbiel's comparables ranged from November 2006 to April 2011. Krehbiel made a time adjustment to comparable sale 1 (the November 2006 sale) and concluded a time trended value per square foot. (*Id.*) Krehbiel did not make any time adjustments to his other five comparables. After adjusting comparable sale 1, the comparables ranged from $11.18 per square foot to $42.76 per square foot. (*Id.*) Krehbiel stated that

> "sales 1, 2, and 3 are considered to be comparable and applicable to the subject property. * * * Sale[s] 4 and 5 share some comparable characteristics but are considered inferior in location and size but bracket the other properties and indicate both a low end and high end range of costs per square foot."

(*Id.* at 22.) He also stated that "[a]ll of the comparable properties, with the exception of [s]ale 5, are corner sites and command a premium for the exposure." (*Id.*) After taking the differences into consideration Krehbiel "estimated that the subject property would command between $28.00 and $35.00 per square foot." (*Id.*) Krehbiel determined that the subject property's real market value was $28 per square foot, or $1,427,000 (rounded). (*Id.*)

Karcher testified regarding Krehbiel's comparable sales. He testified that sale 1, on West 11th Street, was developed as a KFC fast food restaurant and is not comparable to the subject property because it has better access, better visibility, and more room for a drive-thru. (*Cf.* Def's Ex A at 20-21.) He testified that sale 2 on River Road was developed as a Walgreens and is a

level lot. Karcher testified that sale 4, on Pearl Street,[1] was purchased to develop four-story campus housing and that no campus housing developer would be interested in the subject property.

E.      *Tax and assessment roll values and requested real market values*

The subject property's 2012-13 tax roll real market value was $755,000 and its maximum assessed value was $766,581. (Ptf's Compl at 2.) Plaintiff requests a 2012-13 real market value of $430,000 based on the appraisal completed by Roman and Hansen. (Ptf's Ltr at 1, Oct 2, 2013.) Defendant's appraiser concludes that the 2012-13 real market value was $1,427,000. (Def's Ex A at 2-3.)

## II.  ANALYSIS

The issue before the court is the real market value of the subject property as of the assessment date for the 2012-13 tax year. The assessment date was January 1, 2012. ORS 308.007; ORS 308.210.[2] "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property * * * means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

There are three approaches to valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property, even if one or more of the

---

[1] The Q street property and the Pearl Street property are identified as sales 4 and 5 respectively in Defendant's Exhibit A on page 20; however, on page 21 they have been switched.

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

approaches is found to be inapplicable. *See* ORS 308.205(2); OAR 150-308.205-(A)(2).[3] Each party considered all three approaches and agreed that the sales comparison approach was the only applicable approach to value the subject property.

Plaintiff argues that the issue in this case is the subject property's physical detriments. The subject property is bisected by a road and, in Plaintiff's opinion, the remaining parcels are too small for significant commercial development. Plaintiff also contends that the access road diminishes the real market value of the subject property by impacting access between the two parcels. Plaintiff alleges that the visibility of the subject property is negatively impacted by the embankment and landscaping. Defendant argues that the access road, topography, and development potential of the subject property are superior to Plaintiff's claims or enhance the appeal of the subject property.

As the party seeking affirmative relief, Plaintiff bears the burden of proof. *See* ORS 305.427. Plaintiff must present the greater weight of evidence to support its requested real market value. *See Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor,* TC-MD No. 110300D, WL 879285 (March 13, 2012). "[T]he court has jurisdiction to determine the real

/ / /

---

[3] Oregon Administrative Rules (OAR)

market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A. *Plaintiff's real market value evidence*

Plaintiff's witnesses testified persuasively that the access road bisecting the subject property would negatively impact its development potential. Hansen testified that, although he could not find a comparable sale with a bisecting access road, some of his comparable sales included undevelopable area that would reduce their market values. Hansen's comparable sales bracketed the subject both in quality and sale date. The court finds that Plaintiff presented persuasive evidence and met its burden of proof that the subject property's real market value as of January 1, 2012, was less than the tax and assessment roll real market value of $755,000.

In his sales comparison approach, Hansen relied on five comparable sales and one listing with an offer. Listings are not completed market transaction and are given less weight than completed market transactions. *Cf.* OAR 150-308.205-(A)(2)(c). Hansen's comparable 1 sale was a "bank disposition and reflect[ed] a motivated seller." "When nontypical market conditions of sale are involved in a transaction * * * the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c). Hansen made qualitative adjustments to the sale for the non-typical market condition. However, given the availability of other, arms-length, transactions the court gives comparable sale 1 less weight.

Hansen's four other comparable sales indicated a value range of $8.27 to $32.91 per square foot for the subject property. Hansen's sale 2, which sold for $8.27 per square foot, was a smaller, irregular lot with inferior zoning, and an unusable portion located on the northern end of the lot. Hansen rated sale 2 a good indicator of value for the subject property. The court

disagrees and finds that, based on its zoning, location, and exposure, sale 2 is inferior to the subject property. Hansen's sale 4, which sold for $15.24 per square foot, was a larger, similarly zoned, level lot, which Hansen determined to be a high indicator of value. The court finds that sale 4 is similar to the subject property and is a good to slightly high indicator of value. Hansen's sale 5 was a smaller, level lot of irregular shape that sold for $26.95 per square foot. Sale 6 was a smaller, level corner lot that sold for $32.91 per square foot. Hansen determined his comparable sales 5 and 6 were high indicators of value. Hansen's testimony and appraisal report supports a finding that sales 5 and 6 were superior to the subject property.

This court has previously noted that real market value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). Hansen's comparable sales indicate a value range of $8.27 to $32.91 per square foot for the subject property. Hansen selected a value of $8.50 per square foot, or $430,000 (rounded) for the subject property.

Plaintiff's evidence casts some doubt on the feasibility of developing the subject property as a fast food restaurant, but the evidence does not foreclose the possibility of other uses. Some of Hansen's comparable sales were developed for retail and office uses and nothing in evidence indicates that those other uses are not feasible for the subject property. The persuasive evidence presented by Plaintiff indicates that the subject property's real market value would fall into the lower end of the range of value. Plaintiff's requested real market value is at the bottom of the range, with a value most similar to that of Hansen's comparable sale 2, an industrial zoned land that the court found inferior to the subject property. The subject property has some development challenges, but the issues are not severe enough to support a value of $8.50 per gross square foot. The court finds that Plaintiff's evidence supports a value of $13 per square foot for the subject property, for a total real market value of $657,000 (rounded).

B.    *Defendant's evidence*

Defendant's appraiser concluded that the subject property's 2012-13 real market value was $1,427,000. Krehbiel presented five sales and one listing of commercial zoned land. He testified that he considered factors, including zoning, topography, and traffic counts, in choosing his comparable sales. However, with the exception of the Q Street sale, Krehbiel's sales were all corner lots even though the subject property is not a corner lot. Krehbiel acknowledged that the corner lots sold for a premium due to the increased exposure. His first three comparable sales sold in 2006 and 2009 but only one was adjusted for time.

Krehbiel determined that all of his sales had the same potential for development as the subject property. The court disagrees. Although the subject property shared the same commercial zoning as Krehbiel's comparables and therefore had the same legally permissible uses, the subject property differed from the comparables in terms of physical characteristics and location. Krehbiel's sale 4 was purchased for development of off-campus student housing, a use for which the subject property could not be developed. Krehbiel's sale 5 was located 9.2 miles from the subject property in a different city. His other three comparable sales were flat, corner lots without any undevelopable area. The court finds that the sales presented by Krehbiel do not accurately reflect the market for the subject property.

III.  CONCLUSION

After careful consideration of the testimony and evidence presented, the court finds the subject property's real market value was $657,000 for the 2012-13 tax year. Now, therefore,

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 1816212 was $657,000 for the 2012-13 tax year.

Dated this ____ day of January 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on January 21, 2014. The Court filed and entered this document on January 21, 2014.*